**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JASON S., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18 C 8371 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cummings |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant Jason S. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied his application for a period of disability and disability insurance benefits ("DIBs") under the Social Security Act. 42 U.S.C. §§ 416(i), 402(e), and 423. The Commissioner has brought a cross-motion for summary judgment seeking to uphold the Social Security Agency's ("SSA") decision finding that Claimant is not disabled. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3). For the reasons stated below, Claimant's motion for summary judgment [13] is granted and the Commissioner's cross-motion for summary judgment [18] is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Jason S. as Claimant. For reasons that are unclear, plaintiff includes his social security number in the case heading of his summary judgment memorandum and reply brief. [12, 22]. Plaintiff is advised that the inclusion of such personal information is unnecessary in disability cases.

# I. BACKGROUND

## A. Procedural History

On July 8, 2015, Claimant filed a disability application alleging a disability onset date of May 16, 2015. His claim was denied initially and upon reconsideration. On October 11, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on November 6, 2018, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. § 404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in District Court on January December 20, 2018.

## B. Medical Evidence

### 1. Evidence from Claimant's Treatment History

Claimant injured his neck in 1998 in an automobile accident and underwent cervical fusion surgery at C4-C5. (R. 90). He worked after recovering from the surgery until May 16, 2014, when he experienced severe neck pain after lifting a printer at work. Claimant was treated at the St. Alexius Medical Center for pain that radiated into his mid-back, arms, and fingers. (R. 395). An MRI showed a narrowing of the right C3-C4 and C4-C5 neural foramen with no evidence of central spinal canal stenosis. (R. 405). A cervical myelogram was taken on October 8, 2014 after Claimant's pain did not fully respond to treatment. It showed mild to moderate degenerative changes at C6-C7 with foraminal stenosis. (R. 406). Claimant continued to experience significant radicular pain that did not abate with conservative care. On February 26, 2015, therefore, he had a second cervical fusion at the C6-C7 level by Dr. George Cybulski. (R. 499). Dr. Cybulski noted that Claimant suffered from a herniated disc at that level with radiculopathy that required a discectomy and fusion.

Claimant underwent a number of post-operative examinations that showed continued discomfort. A July 20, 2015 x-ray showed intact surgical hardware in his cervical spine with no fracture and normal vertebral bodies. (R. 512). Nevertheless, Dr. Cybulski noted four days later that Claimant's cervical range of motion was severely limited and that he was unable to rotate his head because of pain. (R. 460). Claimant also developed severe photophobia with blurred near-sight vision after his surgery. (R. 483). Neurological ophthalmologist Dr. Nicholas Volpe prescribed reading glasses and sunglasses to reduce his discomfort but had no other specific recommendation. (R. 483). A brain MRI carried out on July 14, 2015 showed no abnormalities. (R. 596).

On October 30, 2015, Claimant was examined at the Rehabilitation Institute of Chicago by Dr. Marshall Benjamin. Dr. Benjamin noted that Claimant was taking Oxycodone, Flexeril, Gabapentin, and ibuprofen for his pain but that these medications were less effective than they had been in the past. Claimant described his pain as eight out of a scale of one to ten and stated that it radiated down his spine and into the shoulder. (R. 587). Dr. Benjamin further noted that Claimant displayed "moderate pain behaviors" accompanied by anxiety, crying, and "some paranoia." (R. 598).

Claimant was also examined at the Rehabilitation Center by Dr. James Atchison. Dr. Atchison noted a marked restriction in Claimant's cervical rotation as well as depression and anxiety. His treatment note states that Dr. Atchison had consulted with pain psychologist Dr. Song to find that Claimant needed to undergo a "chronic pain program" that would involve an interdisciplinary effort to adjust Claimant's pain medication and increase his functional abilities by providing cognitive behavioral therapy, occupational and physical therapy, and medical education. (R. 599). Dr. Atchison noted that Claimant was concerned that his insurance would

not cover the proposed plan, and the record does not reflect that he entered the pain program that Dr. Atchison recommended.

## 2. Evidence From the Medical Experts

On November 4, 2015, the state-agency expert Dr. Lenore Gonzalez found that Claimant could lift up to 20 pounds occasionally and 10 pounds frequently. He could sit, stand, or walk up to six hours during an eight-hour workday. Dr. Gonzalez stated that Claimant could frequently stoop, could occasionally crouch, crawl, and climb stairs, but could never climb ladders. (R. 132). State-agency expert Dr. Vidya Madala agreed with those findings in her reconsideration report on December 18, 2015. (R. 146).

State-agency psychologist Dr. Steven Fritz also issued a report on October 30, 2015 finding that Claimant suffered from an affective disorder that imposed mild restrictions on his activities of daily living ("ADLs") and in his ability to maintain concentration, persistence, or pace. No limitations were noted in his social functioning and Claimant had not experienced any episodes of decompensation. Dr. Fritz therefore concluded that Claimant's depression did not constitute a severe impairment. (R. 128-29).

Three months after his cervical spinal fusion, Dr. George Cybulski issued a "Certification to Be Off Work" form on May 15, 2015 stating that Claimant would not be able to undertake any form of employment "for at least 24 months." (R. 423). On October 26, 2016, Dr. Cybulski was deposed as part of Claimant's application for workers compensation benefits. He stated that Claimant has a decreased range of motion as a result of his spinal fusion. He also suffers from weakness in his arms and neck with a loss of deep tendon reflexes in his triceps. Lifting more than 10 pounds would cause additional pain. Claimant cannot sit for more than 30 minutes at a time. Dr. Cybulski admitted that no vertebral disc impinges on a nerve root following the

4

removal of the C6-C7 herniated disc but confirmed that Claimant continues to suffer from chronic cervical radicular pain. (R. 624-28).

On June 25, 2015, Dr. Edward Goldberg examined Claimant and issued a report. Dr. Goldberg noted that he had examined Claimant prior to his cervical fusion and found stenosis at the C6-C7 level that could have been the cause for his neck an upper extremity radiculopathy. Dr. Goldberg reviewed medical records related to the February 26, 2015 surgery but was not able to see the February 27, 2015 x-rays of Claimant's neck. As a result, Dr. Goldberg chose not to measure Claimant's cervical range of motion because he was unable to assess the stability of the surgical devices inserted at C6-C7. He did find, however, that Claimant had 4/5 strength at C5-T1 bilaterally. Dr. Goldberg stated that Claimant had not yet reached maximum medical improvement but was still capable of performing sedentary work. (R. 433-35). He confirmed that finding in an addendum report issued on June 26, 2015. (R. 431).

On October 12, 2015, psychologist Dr. James Gioia examined Claimant. He found that Claimant displayed an "inappropriate" affect level with limited insight and poor judgment. Dr. Gioia performed a mental status exam showing that Claimant could only repeat four digits backwards and five forwards. He stated that Claimant was oriented to time and person "but not oriented to place." His social and interpersonal skills were described as "rather primitive." Dr. Gioia concluded that Claimant would need help with managing money and diagnosed him with a dysthymic disorder. (R. 557-58).

### 3. Evidence From Claimant's Testimony

Claimant appeared at the June 23, 2017 hearing and briefly described his symptoms to the ALJ. He testified that pain shoots down his spine into the scapular area of his back, through the shoulder and triceps, and then to his forearm and inner wrists. (R. 91). Claimant described

5

the pain as "extreme" and stated that "it stops me in my tracks." (R. 92). Sitting increases his pain more than any other activity and Claimant is only able to sit for 10 to 15 minutes before it becomes "unbearable." (R. 100). He can walk for five to 10 minutes at a time. (R. 103). Even lifting a gallon of milk causes radicular pain through Claimant's spine, back, and arms. (R. 101). Claimant described his daily activities as "basically changing positions" and sitting in a recliner with a heating pad. (R. 102). Claimant lost his medical insurance after he was fired from his prior job as a bank loan officer at a time that Claimant did not identify. He admitted, however, that he had not sought out any low-cost clinics or emergency room treatments for his condition.

### 4. The ALJ's Decision

The ALJ issued a decision on October 11, 2017 finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decisions, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since his alleged onset date of May 16, 2014. His only severe impairment at Step 2 was degenerative disc disease, though the ALJ also found Claimant's affective disorder constituted a non-severe impairment. No limitations were found that in Claimant's understanding, remembering, or applying information; interactions with others; concentration, persistence, or pace; or in his ability to adapt and manage himself. None of these impairments met or medically-equaled a listing at Step 3 either singly or in combination.

Before moving to Step 4, the ALJ assessed Claimant's testimony about his symptoms by finding that his "complaints greatly exceed the medical findings and treatment" record. (R. 68). The ALJ also weighed some – but not all – of the expert reports. He gave "great" weight to Dr. Goldberg's assessment that Claimant could perform sedentary work but rejected Dr. Cybulski's May 2014 report as well as the remarks he made in his October 2016 deposition. The ALJ gave

little weight to the state-agency expert's assessments of Claimant's physical RFC. He failed to assess the state-agency psychologist's report, however, or the consulting psychologist Dr. Gioia's report.

The ALJ further found that Claimant had the RFC to carry out a reduced range of sedentary work as that term is defined in 20 C.F.R. § 404.1567(a). He included a number of restrictions on Claimant's work ability including a finding that he could not move his neck more than 75 percent of a normal range of motion. The ALJ also made the following determination: "[Claimant] has no limitations in his ability to sit throughout an 8 hour workday. The claimant can stand and/or walk for ten continuous minutes, and for a total of two out of eight hours. The claimant needs to alternate his position such that he stands and/or walks for no more than five minutes after sitting for one hours." (R. 67). The ALJ then asked the VE at Step 4 if a person with Claimant's RFC would be able to perform his past work as a bank loan officer. The ALJ stated that Claimant would not be able to sustain that work but that other jobs were available to him in the national economy. The ALJ relied on that testimony to find at Step 5 that Claimant was not disabled. (R. 63-74).

## III. DISCUSSION

Claimant argues that the ALJ erred by (1) improperly assessing his symptom testimony, (2) failing to explain the basis for the RFC, and (3) incorrectly finding at Step 3 that Claimant's impairment did not meet listing 1.04(A) (disorders of the spine). Because the Court agrees with Claimant's first two arguments, it does not address the Step 3 issue.

### A. The ALJ Should Reassess Claimant's Symptom Testimony

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected

7

to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation). [2]

The ALJ began his evaluation of these factors by correctly noting that the "record shows relatively little medical evidence" and that the objective tests it contains are disproportionate to the severity of the symptoms that Claimant described. He pointed out as well that Claimant did not seek treatment for his neck pain after 2015. (R. 68). *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (stating that "infrequent treatment . . . can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment."). The ALJ then took the appropriate step of asking Claimant why he did not pursue more treatment for his neck. Claimant testified that he lost his health insurance when he was terminated from his job at Wells Fargo and never sought free or low-cost health care. (R. 68).

Beyond that, however, the ALJ failed to properly address the factors that govern a symptom analysis. A claimant's testimony should be evaluated by considering the scope and

---

[2] Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They do not have the force of law or a regulation, though they are binding on the SSA. *Id*.

nature of his or her daily activities. SSR 16-3p, 2017 WL 5180304, at *7. Claimant stated very little about his ADLs at the hearing, in part, because the ALJ did not inquire about them. Claimant said that he spent most of his days "changing positions," lying down in a recliner, and listening to sports radio and political shows on television. (R. 102).

Like most disability claimants, however, Claimant also submitted a written function report that provided an additional description of his ADLs. He stated that he could no longer clean, cook, or shop. He has difficulty shaving or putting on socks and performs no household chores. He leaves home four times every two months and only has social contact with others by talking on the phone. (R. 327-34). The Seventh Circuit has "repeatedly emphasized that an ALJ is supposed to consider a claimant's limitations in performing household activities." *Schreiber v. Colvin*, 519 Fed.Appx. 951, 961 (7th Cir. 2013) (citing cases). Instead of doing so, the ALJ only noted that Claimant spent most of the day in a recliner with a heating pad and overlooked everything that Claimant stated in the written report about his ADLs. An ALJ cannot build a bridge between the record and the symptom analysis without accounting for what the claimant alleges that he can do on a daily basis. An ALJ cannot build a bridge between the record and the symptom analysis without accounting for what the claimant alleges that he can do on a daily basis.

Most of Claimant's alleged restrictions in his ADLs were related to his pain. An "ALJ must consider the claimant's . . . medication" as part of a symptom analysis, *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009), and the ALJ followed that directive by noting that Claimant took pain medications and muscle relaxants such as Oxycodone, Flexeril, and Gabapentin. He also took other narcotics such as Percocet. Merely listing a claimant's pain medications, however, does not explain how the ALJ considered them unless the ALJ draws some connection between

9

the medications and the symptom evaluation. *See Farley v. Berryhill*, 314 F.Supp.3d 941, 947 (N.D.Ill. 2018) (explaining that "mentioning them . . . doesn't let the reviewing court know what the ALJ thought about them and how they played into" the symptom evaluation). The ALJ in this case gave no indication of what Claimant's medications indicated about his testimony. That is troubling because the fact that Claimant's treaters prescribed powerful narcotics suggests that – unlike the ALJ – they accepted what Claimant said about his pain. *See*, *e.g.*, *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) ("[T]he fact that physicians willingly prescribed drugs and offered other invasive treatment indicated that they believed that claimant's symptoms were real."); *see also Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). That did not require the ALJ to credit everything that Claimant said on the issue; however, the ALJ could not reject Claimant's testimony without drawing some link between his prescriptions and the ALJ's conclusion.

A more complete consideration of pain medication was especially important in this case because the ALJ accused Claimant throughout the decision of exaggerating his pain. (R. 68, finding that Claimant's "complaints greatly exceed the medical findings and treatment in the record"). He cited several factors to support that finding. The ALJ noted, for example, that Claimant wore a neck brace even though no doctor had prescribed it to him. The ALJ implied that a doctor would have done so had Claimant's pain been as serious as he alleged. Since Claimant's doctors prescribed powerful pain medications, however, it is difficult to see why Claimant also needed a prescription for a more conservative treatment measure like a neck brace in order to be believable. It is well settled, moreover, that a claimant's use of devices designed to relieve pain without a doctor's prescription is not a proper ground for questioning the claimant's testimony. *See Terry*, 580 F.3d at 477-79 (addressing the use of a walker); *Eakin v.*

10

*Astrue*, 432 Fed.Appx. 607, 613 (7th Cir. 2011) (stating that "the fact that an individual uses a cane not prescribed by a doctor is not probative of her need for the cane in the first place"). Although these cases address assistive devices related to walking, the Court can see no meaningful difference between relying on a cane without a doctor's prescription and Claimant's use of a neck brace.

The ALJ also called into question Claimant's motives for seeking disability benefits. Claimant told the ALJ that he had filed a wrongful termination claim against his former employer and was also seeking worker's compensation benefits. Based on that, the ALJ claimed that there was a "possibility of monetary gain" that led Claimant to present himself as more limited than he really was. (R. 71). The Court disagrees with this reasoning. While it is correct that a claimant's motivation to exaggerate his or her symptoms in order to obtain disability benefits can be a legitimate reason for discounting the claimant's testimony, *see Rycroft v. Berryhill*, No. 17-0654, 2017 WL 5952679, at *7 (W.D.Wash. Dec. 1, 2017); *Britt v. Berryhill*, No. 15 C 10320, 2017 WL 3189329, at *4 (N.D.Ill. July 27, 2017), this principle has its limits. An ALJ must do more than raise the specter of an adverse motive because – by definition – *every* claimant who applies for disability benefits seeks "monetary gain." *See Hann v. Comm. of Soc. Sec. Adm.*, 219 F.Supp.3d 1053, 1057 (D.Ore. 2016) (citing cases); *Lucero v. Colvin*, No. 12-cv-2960, 2014 WL 1292859, at *6 (D.Colo. March 27, 2014). "If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible." *Hann*, 219 F.Supp.3d at 1057 (citation omitted). To call a claimant's testimony into question, therefore, an ALJ must cite evidence that shows a causal link between a claimant's motive and the alleged exaggeration of his symptoms.

11

The only element of the ALJ's analysis that could meet that requirement was his repeated finding that the objective record was at odds with the degree of pain that Claimant described. The ALJ cited x-rays, MRIs, and other objective findings to argue that Claimant's allegations were greater than what could be expected from the record. For the most part, the ALJ was correct in pointing out that Claimant's testimony about the severity and persistence of his pain exceeded what objective data like imaging tests showed. The Court agrees that the ALJ was entitled to rely on the objective record to question what Claimant stated. Nevertheless, an ALJ must address this issue with some care by also keeping in mind that "pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant." *Carradine*, 360 F.3d at 753. The Seventh Circuit has advised ALJs again and again that "[i]t would be a mistake to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain.'" *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010); *see also Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) ("Pain can be severe to the point of being disabling even though no physical cause can be identified[.]").

The ALJ did not consider this directive, and his oversight illustrates the consequences of failing to look beyond objective data like x-rays and MRIs. Claimant was examined at the Rehabilitation Institute of Chicago by Dr. James Atchison who diagnosed him with a variety of disorders including chronic opioid dependence, depression, and anxiety. (R. 599). The ALJ cited the opioid diagnosis to claim that Dr. Atchison referred Claimant to a "pain rehab program" to get him off narcotics. The ALJ also noted that Dr. Atchison found that claimant's "symptoms and findings" were out of proportion to his cervical fusions at C5-C6 and C6-C7. The ALJ

12

placed great emphasis on this point to claim that it was consistent with his observation that Claimant was exaggerating the severity of his symptoms. (R. 70-71).

By construing Dr. Atchison's note as support for his own findings, the ALJ overlooked what Dr. Atchison actually stated about Claimant's condition. It is true that Dr. Atchison found that Claimant's cervical range of motion was greater than the x-rays suggested it should be. He further stated, however, that that was because Claimant was suffering from kinesiophobia – "a state where an individual experiences excessive, irrational, and debilitating fear of physical movement and activity as a result of a feeling of susceptibility to painful injury or reinjury." https://www. ncbi.nim.nih.gov/ pmc/articles/ PMC5467352 (last visited Jan 9, 2020); *see also Lowrey v. Astrue*, No. 4:09-cv-519, 2010 WL 3718095, at *11 n.23 (E.D.Mo. Sept. 14, 2010) (defining kinesiophobia as the "morbid fear of movement") (citation omitted). That is, the disparity between Claimant's complaints and the record was real; however, that gap was *itself* part of his medical condition because kinesiophobia played a role in Claimant's subjective experience of his pain.

Instead of criticizing Claimant as the ALJ suggested, Dr. Atchison stated that Claimant required treatment for his condition. Dr. Atchison noted that he had conferred with pain psychologist Dr. Song to find that Claimant required a "chronic pain program" to address his perception of pain and "to actively engage the brain and utilize his own nervous system to decrease the pain." That included:

> [A] full day functional pain multidisciplinary rehabilitation program with medical management from physiatry, physical therapy, occupational therapy, pain psychology, rehabilitation nursing education, relaxation training including biofeedback, postural retraining, ergonomics, and aerobic and muscular conditioning, including development of [a] home exercise program. Specific goals include decreasing the patient's pain level, increasing functional ability, and optimizing medication usage.

13

(R. 599). By failing to account for Dr. Atchison's report, the ALJ overlooked that the interdisciplinary program that he dismissed as "rehab" meant that Claimant's pain involved physical *and* psychological components that required cognitive behavioral therapy, pain psychology, and biofeedback training. The ALJ could not place the kind of emphasis he did on the objective record without first accounting for the possibility that what the ALJ considered to be Claimant's "exaggeration" of pain was, in fact, a function of his mental condition. Remand is therefore necessary so that the ALJ can accurately review all of the record and restate the reasons for the symptom analysis.

> **B.     The ALJ Must Reassess the RFC**

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of activities of daily living ("ADL"); medical source statements; and the effects of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *5. The RFC "must include a narrative discussion describing how the evidence supports *each conclusion*, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (emphasis added).

The ALJ failed to satisfy these requirements in finding that Claimant could rotate his neck up to 75 percent of a normal range of motion. (R. 67). The ALJ did not explain how he reached that finding but the Commissioner notes that examining expert Dr. Goldberg found that Claimant could perform sedentary work. This finding regarding sedentary work does not provide any support for the ALJ's cervical finding. Dr. Goldberg did not place any limitations on Claimant's ability to carry out sedentary work but that does not support the ALJ's finding under these facts: Dr. Goldberg declined to test Claimant's neck movement at the June 15, 2015 exam because he did not have the neck x-rays that would show the stability of the materials inserted during Claimant's spinal fusion surgery.[3] (R. 434). Thus, Dr. Goldberg had no knowledge of Claimant's cervical range of motion.

That leaves only two record citations that the ALJ made concerning Claimant's neck movement. The first was a July 14, 2015 note from surgeon Dr. Cybulski that the ALJ interpreted as showing "*some* decreased sensation and limitation in the cervical spine range of motion." (R. 70) (emphasis added). In reality, the note indicates that Claimant had more than "some" cervical restrictions. It states that Claimant's neck was "severely restricted in all planes," showed only "5 deg[rees] flex[ion], and that Claimant was "unable to rotate due to pain." (R. 460). That is clearly at odds with the 75 percent cervical rotation that the ALJ included in the RFC.

The second entry was Dr. Atchison's report discussed above, *supra* at Sec. III(A), referring Claimant to a chronic pain program. Dr. Atchison found that Claimant showed a

---

[3] On remand, the ALJ should explain in greater detail why Dr. Goldberg's report merits great weight in light of Dr. Atchison's finding that Claimant suffers from kinesiophobia. Dr. Goldberg was unaware of this diagnosis because his report predates Dr. Atchison's assessment. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 772, 728 (7th Cir. 2018).

15

"markedly restricted cervical [range of motion]." (R. 599). The ALJ discounted that finding because Dr. Atchison also stated that it was "out of proportion" to Claimant's spinal fusions. As noted, however, Dr. Atchison followed up his finding by stating that Claimant's disproportionate range of motion was due to kinesiophobia. (R. 599). The ALJ failed to grasp that Dr. Atchison stated that Claimant required significant psychological intervention "to actively engage his brain" in reducing his perceived level of pain. Nothing in the record suggests that Claimant enrolled in the chronic pain program that Dr. Atchison recommended, and the ALJ did not ask Claimant anything related to the topic. The ALJ therefore had no sound basis for citing Dr. Atchison's report to find that Claimant could move his neck up to a 75 percent level of a normal rotation.

In addition to the cervical issue, the Court is unable to follow what it was that the ALJ said that Claimant could do as part of the RFC. He stated that Claimant

> has no limitations in his ability to sit throughout an 8 hour workday. The claimant can stand and/or walk for ten continuous minutes, and for a total of two out of eight hours. The claimant needs to alternate his position such that he stands and/or walks for no more than five minutes after sitting for one hour.

(R. 67). This assessment is internally inconsistent. As the RFC states, Claimant needed a sit/stand option that allowed him to stand for five minutes after sitting for one hour. However, a person who has *no* restrictions in sitting for eight hours a day – as the ALJ said was the case here – does not need a sit/stand option. The ALJ additionally stated as part of the sit/stand option that Claimant could stand or walk "for no more than five minutes." He then contradicted that finding by stating that Claimant could also stand or walk "for ten continuous minutes" up to two hours a day. The ALJ therefore reached three mutually-exclusive findings: (1) Claimant could sit for eight hours a day; (2) he could *not* sit for eight hours because he needed to stand or walk every hour for no more than five minutes at a time; and (3) he could stand or walk ten minutes at a

16

time. Remand is therefore required so that the ALJ can address the record with greater accuracy and build a logical bridge between the evidence and the RFC assessment.[4]

## III. CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment [13] is granted. The Commissioner's motion for summary judgment [18] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) reconsider the reasons that support the limitations associated with the Paragraph B factors; (2) weigh the reports of Dr. Fritz and Dr. Gioia; (3) reassess Claimant's symptom testimony by using the criteria set out in SSR 16-3p; (4) reweigh Dr. Goldberg's report; and (5) restate the RFC finding and the reasons that support it.

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: January 21, 2020**

---

[4] Since this case already requires remand, the ALJ should reassess Claimant's non-severe mental impairment. The state-agency psychologist Dr. Fritz found mental restrictions that the ALJ rejected without weighing (or even citing) Dr. Fritz's report. The ALJ also applied the "special technique" at Step 2 to determine the severity of Claimant's condition. *See* 20 C.F.R. § 404.1520a (describing the special technique). He found that no mental restrictions existed but failed to adequately explain the basis of his reasoning. The ALJ stated that Claimant had a college education and lived with his mother. Clearly, however, a person can experience mental limitations even though he is well educated and lives with his mother. The ALJ further found that Claimant was cooperative but Courts have rejected that as a reason for finding that no limitation is present. *See Voorhees v. Colvin*, 215 F.Supp.3d 358, 385 (M.D.Pa. 2015). The ALJ concluded that Claimant was "oriented" and had an appropriate affect. That failed to note that Dr. Gioia stated that he was *not* oriented to place and had an "inappropriate" affect. (R. 558). The ALJ also reasoned that Claimant could handle his finances but Dr. Gioia said that he could not do so. (R. 558). Like Dr. Fritz's report, the ALJ failed to assign any specific weight to Dr. Gioia's findings.

17